### GREEN et al. v. TERWILLIGER et al.

### (Circuit Court, D. Oregon. August 29, 1892.)

1. **SUIT IN EQUITY TO SET ASIDE DEED AND WILL—HISTORY AND CHARACTER OF SUIT.**

   In 1848 Mrs. Philinda Green, then a widow, was married to James Terwilliger, a widower. In 1850 they took up a donation claim, containing 630 acres of land, then outside, but now within, the city limits of Portland, Or., the east half of which was designated in the patent as the property of the wife. At the time of the marriage, Mrs. Green had two sons, named William O. and Calvin. By her second marriage she had two daughters, one of whom died. The other, Julia Viola, was named in the will as sole heir. At the time of her marriage to James Terwilliger she was unable to write, and her husband thereafter taught her how to write her own name. A deed (X) bearing date September 2, 1872, was offered in evidence, purporting to be a deed from Philinda Terwilliger and James Terwilliger, of the east half of the donation claim, to the daughter, Julia Viola Terwilliger. A will bearing date August 14, 1873, was offered in evidence, purporting to be the will of Philinda Terwilliger, bequeathing to her daughter, Julia Viola Terwilliger, the east half of the donation claim, and to her son William O. Green a clock which she had brought across the plains. On August 14, 1873, the date of the execution of the will, her son Calvin Green was murdered at Eureka, Nev., but the fact of his murder was not known until a week thereafter. Philinda Terwilliger died October 19, 1873. This suit was commenced by complainants, the widow and heirs of William O. Green, deceased, in March, 1889, to obtain a decree for the discovery, production, and cancellation of the deed and the will, and to have the same set aside as false, forged, and fraudulent instruments; and about one month thereafter the will was proven up, and admitted to probate, in the county court of Multnomah county, Or. The contention on the part of the complainants is that the deed and will are forged instruments, and on the part of the defendants that the deed and will are genuine and valid. (For further facts, see opinion.) Decree rendered in favor of complainants.

2. **JURISDICTION OF UNITED STATES COURT—STALENESS OF CLAIM.**

   A demurrer was interposed to complainants' bill upon the ground that the court had no jurisdiction of this suit. This demurrer was overruled. An answer was then filed, denying that the deed or will were false or forged, and alleging that both instruments were genuine. Upon the trial the defendants, for the first time, contended that the complainants' claim, as made in the bill, was stale. *Held* that, if the bill was defective, in not clearly stating at what particular time complainants were informed of the existence of the disputed documents, objections thereto upon that ground should have been earlier made, by demurrer or otherwise, and that under the pleadings, and upon all the facts and circumstances of this case, the defendants were not in a position to make this claim.

3. **COMPARISON OF HANDWRITING—EXPERT TESTIMONY.**

   Where testimony is admissible as to comparison of handwriting, care should be taken that the standard of comparison is genuine. The testimony of experts should be confined to a comparison of the disputed signatures with the admitted or clearly-proven genuine signatures.

4. **SAME—ADMISSIBILITY OF EXPERT TESTIMONY—LAWS OF OREGON—STATUTES OF UNITED STATES.**

   Under the laws of Oregon, (1 Hill's Ann. Laws, § 765,) and section 858 of the Revised Statutes of the United States, the testimony of expert witnesses, by comparison of handwriting, is clearly admissible.

**5.** SAME—WHERE DOCUMENTS ARE IN EVIDENCE FOR OTHER PURPOSES.

Where the documents upon which the comparison of the handwriting is made are properly in evidence in the cause for another purpose, the handwriting of the signatures to the different instruments may always be compared by the expert witnesses and by the court, and the fact of such signatures being genuine or false may be determined from such comparison, weighed in connection with the other testimony in the case.

**6.** SAME—VALUE OF TESTIMONY BY COMPARISON OF HANDWRITING.

In many cases it is more satisfactory to allow a witness to compare the writing in issue with other writings, of unquestioned authority as to genuineness, than it is to compare it with the standard which he may have formed or retained in his mind from a knowledge of the party's handwriting.

**7.** SAME—EXPERT TESTIMONY—DUTY OF COURT.

Expert testimony is admissible, and often necessary, in cases of this character, in order to bring out the essential traits and characteristics of a person's handwriting, which might not otherwise be noticed by the untrained eye of the judge or jurors. But in all cases the court, if the case is tried without a jury, must be the final and impartial arbiter to determine the credibility and weight of this kind and character of testimony, by the guiding lights of precedent, experience, and conscience, with due regard to the rules and presumptions of the law, the character of the witnesses, and the property rights of individuals.

**8.** POSITIVE AND DIRECT TESTIMONY—VALUE OF.

The weight and value of positive testimony of a party's handwriting depends upon the frequency with which the witnesses have had occasion to carefully observe the handwriting, and how recent their opportunities of noticing the handwriting have been, and whether or not the witnesses have any interest in establishing the genuineness of the signatures in dispute.

**9.** INDEPENDENT FACTS AND CIRCUMSTANCES—EFFECT OF.

Independent of the testimony of experts, and comparisons of handwriting, the opinion reviews at length the testimony of witnesses as to the reasons given why Philinda Terwilliger should have selected her daughter, Julia, as her sole beneficiary; the testimony of Waterman, that he drew the will, and was aware of the law of Oregon requiring that the children must be mentioned in the will in order to prevent them from inheriting their share of the estate; the fact that the son William O. was named in the will, and the son Calvin not mentioned; the delay in discovering the will, and in probating it; the fact that the daughter, Julia, was first informed as to the existence of the will seven years after its date, and that neither the deed nor the will were delivered to her until after the commencement of the suit; and other facts. *Held*, that such facts tended to cast a doubt as to the truth of some of the testimony offered upon the part of the defendants, and to raise a suspicion as to the genuineness of Philinda Terwilliger's signature to the deed and to the will, and tended to show that it was unreasonable, unnatural, and improbable that Calvin Green's name should have been omitted from any will which his mother might have made on the 14th of August, 1873, and that, in the light of all these circumstances, the court could not say that the genuineness of the documents was established by positive testimony, which was entitled to the greatest weight, when compared with all the other testimony in the case.

**10.** SIGNATURES TO DEED AND WILL DECLARED TO BE FORGERIES.

*Held*, after review of all the testimony, that, from every standpoint from which the examination of the evidence was considered, the mind of the court was irresistibly led to the conclusion that the signatures of Philinda Terwilliger to the deed and will were never signed by her, and that both the signatures were false and forged.

(Syllabus by the Judge.)

Bill by Clarinda Green (now Clarinda Smith) and Hugh R. Smith, her husband; Anna B. Green (now Anna B. Barnett) and William H. Barnett, her husband; Philinda Green; Mary F. Green, (mother;) and Mary O. Green, a minor, by her next friend, her mother,—against James Terwilliger, T. M. Richardson, Frank Richardson, a minor, and Harry Richardson, a minor, (heirs of Julia V. Richardson, deceased since the commencement of this suit,) to cancel a deed and will. Decree for complainants.

E. W. Bingham and L. L. McArthur, for plaintiffs.

C. B. Bellinger, R. Williams, and P. R. Deady, for defendants.

HAWLEY, District Judge. This is a suit in equity to obtain a decree for the discovery, production, and cancellation of a certain deed and will purporting to have been made by Mrs. Philinda Terwilliger, and to enjoin the defendant James Terwilliger, her husband, from selling or disposing of any of the property described in the bill, beyond the term of his estate therein as tenant by the curtesy. The bill, after stating that James Terwilliger and Philinda Terwilliger became the owners of 630.34 acres of land in Multnomah county, Or., under the donation law; that the east half of said land was designated by the surveyor general to be held by said Philinda Terwilliger in her own right; that said Philinda Terwilliger, while still seised of about 150 acres of the east half of said claim, of the value of about $25,000 at the time of her death, died intestate, leaving her son, William O. Green, by her first husband, and her daughter, Mrs. Julia V. Richardson, by her second husband, her sole heirs, succeeding to the inheritance of all her real property, subject only to the estate by the curtesy therein of her husband; that complainants are the heirs, and have succeeded to the interest, of W. O. Green,—states, among other things, that the defendants "have informed your orators that said Philinda Terwilliger had willed all of her said property to her said daughter, Julia, to the entire exclusion of your orators, and that the defendants had the will in their possession; and at other times defendants have stated that said Philinda Terwilliger had deeded said real property to said Julia, and that said James Terwilliger had the deed. Your orators are informed and believe, and allege, that the defendants have such a pretended will or pretended deed in their possession, or under their control; but your orators allege and charge that any will and any deed which the defendants have, or either of them has, or under which the defendants claim, or either of them claims, which purports to divest your orators of any right or interest which they have, as aforesaid, in the said estate of Philinda Terwilliger, as heirs at law, is a false, forged, and fraudulent instrument." The word "forged" was not in the bill, as originally filed, but, after the will had been produced, was inserted, by leave of the court. Complainants are citizens of the state of California. Defendants are citizens of Oregon. A demurrer was interposed to the bill upon the ground that this court had no jurisdiction of the case. This demurrer was overruled. De-

fendants then filed a plea, and answer "fortifying the plea," which was also overruled. The answer to the bill denies that the deed or the will is false or forged.

On the oral argument, defendants, for the first time, claimed that complainants' claim, as made in the bill, was stale. If the bill was defective in not stating at what particular time complainants were informed of the existence of the disputed documents, it might have been made more specific in this respect, if objections or exceptions had been timely made, and the fact considered essential; but upon the pleadings, and under all the facts and circumstances and character of this case, the defendants are not, in my opinion, in a position to make this claim.

The questions submitted to the court are principally questions of fact. The contention on the part of the complainants is that the deed and will are forged instruments, and are invalid. The contention of the defendants is that the deed and will are genuine and valid.

From the testimony it appears that Philinda Terwilliger was born in 1812; that her maiden name was Philinda Lee; that she was married to John H. Green in 1829; that in 1847 she, with her husband and their children, consisting of two sons, named, respectively, William O. and Calvin B. Green, and one daughter, accompanied by her brother Philister Lee and his family, started across the plains for Oregon; that in crossing Snake river her husband was drowned; that the families continued the journey to Portland, Or.; that their daughter died soon after arrival; that the means of Philinda and her children were limited, consisting of two yoke of oxen, two wagons, some cattle, and a little bedding; that the son William O. was then 17 years of age, and Calvin 10 years of age; that in the spring of 1848 the widow, Philinda Green, married James Terwilliger, (one of the defendants,) who was then a widower with children; that after their marriage they settled upon a section of forest land about three miles from the town of Portland, then of no great value; that in 1869 a patent was obtained from the government of the United States for this land, consisting of 630.34 acres; that the east half of this land was designated in the patent to be held by the wife, as by law required,—see Donation Act, (2 Hill's Ann. Laws Or. 1787–1807;) that the land in question is now in the city of Portland, and is of about the value of $300,000; that after the last marriage two daughters were born,—the eldest, named Mary, who died when 12 years of age, and Julia Viola, who subsequently married Thomas M. Richardson, one of the defendants; that Julia died shortly before the argument of this case; that James Terwilliger and his wife continued to reside upon the east half of the donation claim until her death, which occurred October 19, 1873; that the husband is still living at the family residence upon said land, and is now about 84 years of age; that he is still the owner of the entire west half of the donation claim, and is now in possession of the unsold portion of the east half as tenant by the curtesy, having a life estate

therein; that said William O. Green and his brother Calvin, after William's marriage, removed to Walla Walla, in the territory (now state) of Washington; that Calvin B. Green was murdered by ────── Matheny near Eureka, in the state of Nevada, on the 14th day of August, 1873; that, at the time of Philinda Terwilliger's death, her son, William O. Green, and her daughter, Mrs. Julia Viola Richardson, were her sole heirs, and, under the laws of Oregon, if she died intestate, would inherit the unsold portion of their mother's east half of the donation claim; that William O. Green died in Walla Walla in 1878, and the complainants in this suit, when it was brought, were his widow and her four daughters; that since the commencement of this suit two of the daughters have been married, and substitution of parties (complainants and defendants) has been properly entered.

The deed in dispute is marked "Exhibit X," and reads as follows:

Know all men by these presents: That I, Philinda Terwilliger, of the County of Multnomah, State of Oregon, for and in concideration of one dollar in hand paid me by my daughter, Julia V. Terwilliger, of the same County and State, do hereby. sell, bargan, grant and convey unto my daughter, Julia V. Terwilliger, the following described tract of land; east half of the Donation Claim, No. 39, in section nine, ten, 15 and 16, township one south range one east, it being the Donation Claim of James Terwilliger and Philinda Terwilliger in County and State aforsaid, all of the said Land that is not disbosed of after my death and the death of my husband James Terwilliger Shal belong to my daughter Julia V. Terwilliger in hur own Right forever after ower death.

In testimony whareof i have hereinto set my hand and seals this second day of September In the year of ower Lord 1872.

Philinda Terwilliger.

A. Higgins.

Witness                                                James Terwilliger.

William Terwilliger.

It will be observed this instrument, although signed by Philinda Terwilliger and her husband, James Terwilliger, purports on its face to be the deed or will of Philinda Terwilliger only. Her name is written first in this deed, while in all other documents signed by them his name is written first. The peculiar manner in which the instrument is signed by the attesting witnesses has suggested to complainants' counsel the thought that the names of A. Higgins and William Terwilliger were intended as witnesses to the signature of James Terwilliger, only. William Terwilliger was the youngest brother of James, and died in 1876. A. Higgins, the other witness, could not be found, and is supposed to be dead. There may be some question whether or not this document, if genuine, was not intended as a will, and that it should be so treated. If so, then the rights of complainants under the laws of Oregon, which will be hereafter referred to, would not, in any manner, be affected thereby. If it can be treated as a deed, and is genuine, then it is questionable, to say the least, whether, under the evidence, any sufficient delivery was ever made. A deed may be delivered to a third person as a deed to be delivered to the grantee on the happening of some future event, but the de-

livery of the deed to such third person must be absolute for such purpose. McCalla v. Bane, 45 Fed. Rep. 837, and the authorities there cited. But, notwithstanding these suggestions, the testimony as to its genuineness will be first considered.

Mrs. Elizabeth Cathcart Smith testifies that she was present at the residence of James Terwilliger when her then husband, William Terwilliger, was preparing to write a deed, in the year 1872; that, prior to that time, William had written a deed, with the contents of which Philinda was displeased, because it did not give to Julia all she wanted her to have; that witness did not see the second deed, and, if she had seen the first, she paid no attention to it; that before the second deed was written her husband told her to go home, and that he was going to write another deed.

James Terwilliger, on being shown the deed, testified as follows:

"Question. Do you remember when you first saw that instrument? Answer. It was some time ago. Q. Did you see it before your wife died? A. Yes. Q. Is that your signature to it there,—'James Terwilliger?' A. I should think I wrote it. * * * Q. Can you say that she signed that? A. Well, you are a curious man! I have told you that I didn't see her sign it, but that is her signature. Q. Do you remember the circumstances under which it was signed? Do you remember anything about the time or circumstances of the execution of this instrument? A. Well, I don't exactly. Q. Can you tell anything about the instrument, that you remember,—anything of its history,—anything about it, that you know of? A. Well, it was to my place there for years and years, and I don't remember exactly when Mrs. Richardson took it. She took her papers, but it was there for years. Q. Do you remember when it first came into your possession? * * * A. Yes, sir. Q. Where did you keep it there? A. I described once where the will was kept, and that was in the same place amongst her papers. Q. Then you kept this with the will? Do I understand that you kept this instrument along with the will, in the clothespress in a little room adjoining your bedroom, in the house where you reside at the present time, on the Macadam road? A. Yes; I say it was there. * * * Q. Mr. Terwilliger, when was it you first saw this instrument? * * * A. It must have been a good many years ago; probably, shortly after it was written. I do not remember. Q. Do you remember having signed it. A. I remember having signed it; yes. Q. Where were you? A. In my house. Q. Do you remember the time? A. I remember the time, but I do not remember the date. Q. Well, can you describe the time, or fix the time? A. Well, I suppose it was daylight. I do not remember the date. It was after it was written. My wife had signed it, and she fetched it to me to sign, I know. Q. Did you see her sign her name to this deed, as you call it? A. No. I did not see it before her name was signed. Q. You judge it is her signature, from looking at it. Is that what you say? A. Yes, by looking at it. She would not have handed it to me, I do not suppose, if she had not signed it. Q. When was it that you saw that paper; that instrument; that deed, as you call it? * * * A. Well, when she first fetched it to me, and wanted me to sign it. I think I read it, and signed it,—signed my name to it. * * * Q. Do you know what became of the paper then? A. She took it, and, I suppose, put it where it always staid until this suit was commenced. Q. Where was that place? A. It was in the table, under the shelves. The shelves came up, and underneath was a table,—a small table,—and it was in the table drawer. That is where she kept her papers. That is where it was."

Julia Richardson testified that she saw the deed X before her mother died; that she did not see it after her mother's death, until after this suit was commenced; that she supposed it was this deed that her mother referred to the night she died; that her

mother told her at the time that "she had everything fixed just as she wanted it; that everything she had was mine; but she did not mention the word 'will;'" that she had never asked to see the deed after her mother's death. In answer to a question as to when she first remembered seeing this instrument, she said:

"I saw it before my mother's death,—I think, a short time after it was made,—but I did not read it. She insisted on my reading it, and it always made me feel badly when she would speak of making her will, or any papers; and I told her I did not wish to read it, and she told me the contents of it. But, the way she held it, I recognized those signatures of Amos Higgins and my mother's and William Terwilliger. But I did not read the full document, but she told me the contents of it. And I recognize that as my mother's handwriting, without a doubt, and also father's and William Terwilliger's. Mr. Higgins' handwriting I was not acquainted with. * * * Question. Do you remember the time, or about the time, it was that your mother first exhibited this writing to you, as you have just testified? Answer. Well, I don't remember just the time; no. I think it was just very shortly after it was made. I was not at home, I think, when this was made. * * * Q. When do you remember of seeing it again, next after that time? A. Well, I don't think I ever saw it until this suit commenced. I have no recollection of ever seeing it after her death. My father took control of her papers and her effects after she died. * * * Q. Did she ever speak to you, at any time other than at the time you have testified here, concerning this instrument? A. She has. I don't know as especially of this instrument, but to the same effect. She has often told me, and often given me good advice, and told me she wanted me to do certain things; that all she had would be mine; that she had provided for William Green, and did not propose that he should get any of her property. She, also, the night she died, called me to her, and told me that everything she had,—she had everything fixed just as she wanted it, and that everything she had was mine."

The will in question reads as follows:

Know all men by these presents: That I, Philinda Terwilliger, of Multnomah County, Oregon, feeling the uncertainty of life and being of sound mind and memory, and wishing my estate to be disposed of as seems to me right, do make, publish and declare this my last will and testament as follows, viz:

First, I devise, give and bequeath to my daughter, Julia Viola Terwilliger, of Multnomah County, Oregon, the house and furniture in which we now live, and also the undivided east half of the James Terwilliger Donation Land Claim that may not have been sold at the time of my decease.

Second, I give and bequeath to my son, Wm. O. Green, of Washington Territory, my clock which I brought across the plains.

In testimony whereof I have set my hand and seal this fourteenth day of August, eighteen hundred and seventy-three.

Philinda Terwilliger. [Seal.]

In presence of
John Orvis Waterman, } Witnesses.
John Terwilliger, }

Within a month after the commencement of this suit the defendants appeared in the county court of Multnomah county, at Portland, Or., and there produced and filed the will for probate. Proofs of the execution of the will were then made by the ex parte affidavits of John Orvis Waterman, James Terwilliger, and his daughter, Mrs. Julia V. Richardson, and the will was then admitted to probate in "common form," and is on file and of record in the office of the county clerk of Multnomah county. It has been produced for inspection in this court by the attendance of the clerk or his deputy. After the production of the will, complainants made photo-

graph copies of it, which have been admitted in evidence. Complainants also procured an order of this court for an inspection of the deed, which was also photographed by complainants, and the original is filed as an exhibit in the case. John Terwilliger, whose name is signed as a witness to the will, was a brother of James Terwilliger, and left the state in 1881, and soon thereafter died. John Orvis Waterman is the only living witness whose testimony has been obtained. Lapse of time, and the frequent intervention of death, has rendered it somewhat difficult to establish the facts and circumstances of the execution or nonexecution of the will and deed. But by the diligence of counsel there has been procured a vast amount of testimony bearing directly or circumstantially upon the material points involved in this case, and which required two weeks' time to enable counsel to make an able and thorough review of the testimony in their oral arguments. It appears from the testimony that, at the time of Philinda's marriage to James Terwilliger, she was unable to write, and that he taught her how to write her own name. Several deeds conveying portions of the east half of the donation claim, and executed by James and Philinda Terwilliger, were offered in evidence by complainants; also, a power of attorney, executed by James Terwilliger, his wife, Philinda, and daughter, Julia, authorizing William O. Green to administer upon, and settle up, the estate of his brother, Calvin. All these documents were regularly drawn up, in proper form, and written out on legal cap paper or in blank forms, were properly acknowledged, and, with the exception of the power of attorney, duly recorded. Each instrument had been acted upon by the parties thereto, and treated as a genuine document. The deed X and the will were written on paper taken from an ordinary small account book, the paper of which was soft, and the fiber porous, and the paper was poorly and dimly lined. The deed X is written on a sheet taken from one side of the account book, and the leaf on which the will was written was taken from the other side. Four signatures of John Terwilliger, taken from the books of the county clerk, where he had signed his name when receiving money or warrants due him as a justice of the peace, were introduced by complainants. One signature taken from a mortgage signed by John Terwilliger, and a marriage return filled out and signed by John Terwilliger as justice of the peace, were admitted in evidence as the genuine signatures of John Terwilliger; and an account book, containing 50 pages of divers accounts, was also admitted as being in his handwriting. After several objections had been made by defendants to the introduction of the deeds offered by complainants for any purpose, it was finally stipulated, admitted, and agreed that the signatures of Philinda Terwilliger to the deeds and to the power of attorney were genuine. These instruments are dated, respectively, October 26, 1865, June 6, 1868, April 20, 1871, May 1, 1871, June 12, 1871, February 5, 1873, July 24, 1873, September 13, 1873, and two on September 15, 1873. Notice was served upon defendants to produce any documents in their possession, containing the signature of Philinda Terwilliger. In obedience to this

notice, defendants produced the Green family Bible, which had re-
mained in the possession of Philinda Terwilliger until her death.
On the second page of this book, under the name of "Wm. O. Green,
Portland, O. Ter.," is written the name:

Philinda Terwilliger

Bibile

Defendants also produced an old, unsigned, one-dollar bank bill,
dated September 20, 1816, which had apparently been used as a
book mark in the Bible, on the back of which was written the words:

this is mine, Philinda Terwilliger.

They also introduced an old school reader published in 1825, on
the front page of which is some scribbling, and the name "Philester
Lee," and on the second page is the written name "Philinda Lee."
They also introduced an old Hudson Bay Company receipt, dated
July 24, 1856, upon the back of which appeared the following writ-
ing:

Philinda.          Philinda Terwilliger.

Philinda

Terwilliger

Portland

James Terwilliger and Mrs. Julia V. Richardson testified that
they recognized the signatures in these exhibits as being in the
handwriting of Philinda Terwilliger. Mrs. Mary Terwilliger, daugh-
ter-in-law of James Terwilliger, testified that in 1870 Mrs. Philinda
Terwilliger told witness that she had written her name in the
Bible and on the bank bill. Complainants objected to these ex-
hibits upon the ground that there was not sufficient testimony
to establish the fact that any of the writing thereon was the gen-
uine writing or signature of Philinda Terwilliger. There was some
testimony to the effect that Philinda had used a Spencerian copy
book, on nearly every page of which she had written her name.
Defendants were unable to find this book, and James Terwilliger,
in his testimony, says that the children might have destroyed it;
that he thought they had destroyed it.

If testimony is admissible at all, as to comparisons of handwrit-
ing, it is important, in the first instance, to have a genuine signa-
ture admitted or proven beyond all doubt or cavil. "Wherever
proof of handwriting by comparison is permitted, it will be found
that great care is taken that the standard of comparison shall be
genuine. The reason of this rule is obvious. Under the English
statute, comparison of disputed writing is allowable only with
the writing proved to the satisfaction of the court to be genuine;
and the American tribunals which have refused to follow the com-
mon-law rule on the subject of proving handwriting by comparison
have been no less careful than the English legislators to see that
the standards of comparison shall be beyond suspicion, for it is
plain that, if there be any controversy as to the genuineness of
the specimens with which the comparison is to be made, all the
evils pointed out by the opponents of this species of proof become
apparent, and a number of collateral issues are in each case at once
raised." Laws. Exp. Ev. p. 408. See, also, Rog. Exp. Test. p.

331, and authorities there cited. The standards used by complainants, tested by this rule, cannot be said to have been unfairly selected. The consideration of the testimony of experts by a comparison of handwriting should be confined to a comparison of the disputed signatures with the admitted or clearly-proven genuine signatures of Philinda Terwilliger. Defendants contend that such testimony is inadmissible, and in some states it has been so declared; that, if admissible at all, it is entitled to but little weight, and should always be received with great caution. The decisions upon these points are quite numerous, and are referred to, and many of them cited, in Lawson's Expert and Opinion Evidence, (page 377 et seq.,) and in Rogers on Expert Testimony, (notes to sections 136, 137.) Whatever the differences may be as to the rule of admitting this character of evidence, in states having no special statute on the subject, it seems perfectly clear that in this court, under the provisions of the United States laws and those of the state of Oregon, testimony of this character is admissible, and entitled to due weight and consideration. Section 858 of the Revised Statutes of the United States provides that in the courts "of the United States no witness shall be excluded in any action on account of color, or, in any civil action, because he is a party to, or interested in, the issue tried: provided, that in actions by or against executors, administrators, or guardians, in which judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with, or statement by, the testator, intestate, or ward, unless called to testify thereto by the opposite party, or required to testify thereto by the court. In all other respects the laws of the state in which the court is held shall be the rules of decision as to the competency of witnesses in the courts of the United States, in trials at common law and in equity and admiralty." The laws of Oregon provide that "evidence respecting the handwriting may also be given by a comparison made by a witness skilled in such matters, or the jury, with writings admitted or treated as genuine by the party against whom the evidence is offered." 1 Hill's Ann. Laws Or. § 765. This is conclusive upon the question of the admissibility of this character of evidence; but in this connection it is proper to state that the deeds signed by James and Philinda Terwilliger, conveying portions of the east half of the donation claim, were, in my opinion, admissible in evidence for the purpose of showing that certain parts of the land had been sold and conveyed prior to Philinda's death. It may not, under the pleadings, have been actually necessary to introduce this evidence, but it is not irrelevant to the issue raised. The deeds were, in my judgment, properly in the cause for another purpose than that of comparison of handwriting; and hence, under all the decisions upon this subject, a comparison of the handwriting on the deeds could be made with the handwriting of the signatures to the deed X and to the will. In Moore v. U. S., 91 U. S. 274, Bradley, J., in delivering the opinion of the court, said that "the general rule of common law, disallowing a comparison of handwritings as proof of signature, has exceptions

equally as well settled as the rule itself. One of these exceptions is that where a paper admitted to be in the handwriting of the party, or to have been subscribed by him, is in evidence for some other purpose in the case, the signature or paper in question may be compared with it by the jury." See, also, Williams v. Conger, 125 U. S. 413, 8 Sup. Ct. Rep. 933. Where the documents are properly in evidence, the handwriting of the signatures to the different instruments may always be compared by the expert witnesses and by the court, and the fact of the disputed signature determined from such comparison, weighed in connection with all the other testimony in the case. "The genuineness of handwriting, whenever called in question by the one whose handwriting it purports to be, must, of necessity, be determined by comparison of some sort, or by testimony based upon comparison. If the opinion of the genuineness of the writing is not based upon the comparison of it with some other writing in juxtaposition, it must be based on the conception of the handwriting which the witness has retained in his mind. In most cases it is far more satisfactory to allow the witness to compare the writing in issue with other writings, of unquestioned authenticity, than it is to compare it with the standard which he may have formed or retained in his mind. The comparison with the former will ordinarily be more conducive to the ascertainment of the truth than will the latter; and, if there is a science of handwriting, then those who are experts therein should be allowed to express an opinion, based on comparison of the disputed writing with others admitted to be genuine." Rog. Exp. Test. p. 317. The value of expert testimony depends, to a certain extent, upon the general knowledge and experience of the witnesses; their competency, character, and reputation. It depends more or less upon the facts stated by them, which form the basis of their judgment, and the reasons given for their opinion. Expert testimony is admissible, and often necessary, in cases of this character, in order to bring out the essential traits and characteristics of a person's handwriting, which might not otherwise be noticed by the untrained eye of the ordinary judge or juror. By constant practice in examining signatures and handwritings, it is but natural that an expert will readily discover many peculiarities —many distinctive features—of the handwriting, by the aid of tests they have often made and applied, that would not at first blush be discernible to persons unaccustomed to such methods of investigation. The objection to professional expert testimony consists, to a great extent, in the fact that in many cases the witness becomes an active partisan in favor of the party by whom he is employed, and conducts his investigation in the character of an attorney, upon lines most favorable to his side of the case, and when this position is taken the testimony is sometimes given in such a manner as is calculated to deceive and mislead, instead of to enlighten or aid, the court or jury; and this occurs so frequently that courts have often condemned this character of testimony, and declared it to be entitled to but little weight, and that it should be received with caution. But in all cases the court, if the case

is tried without a jury, must be the final and impartial arbiter to determine the credibility and the weight of this kind and character of testimony. It is the duty of the court to observe all the facts stated and conclusions reached by the witnesses, and, after a careful consideration and verification thereof, decide their credibility and weight by the guiding lights of precedent, experience, and conscience, with due regard to the rules and presumptions of the law, the character of the witnesses, and the property rights of individuals.

Complainants introduced the testimony of Edwin M. Arthur, paying teller in Ladd & Tilton's bank; Herman Varwig, paying teller in the Portland Savings Bank; Hardy C. Wortman, formerly paying teller, and now cashier, in the Commercial National Bank; David W. Ross, paying teller in the First National Bank; W. V. Spencer, who had had many years of experience as paying teller and cashier in various banks; A. C. O. Davis, paying teller in the Merchants' National Bank; and Charles F. Patterson, manager of the Western Union Telegraph Company,—all of Portland, Or.; men who, by the necessities of their occupations and business, are often required to carefully examine handwriting, especially of signatures, for the purpose of avoiding the payment of forged checks. Each of said witnesses, upon a comparison of the handwriting of the signature "Philinda Terwilliger" to the deed X and the will with her admitted signatures upon the standards, testified that in his opinion the signatures to the deed X and to the will were forged. Complainants also introduced the expert testimony of Edward Failing, of Portland, and Mr. Hickox and Mr. Hyde, of San Francisco, Cal., who testified to the same effect, and gave, at great length, the reasons for their opinions. The defendants introduced three experts,—Theodore B. Wilcox, a banker of Portland, Or.; D. F. Sherman, cashier of the Oregon National Bank, at Portland; and Dr. R. U. Piper, of Washington, D. C.,—who, from the same comparisons, testified that in their opinion the signatures of Philinda Terwilliger to the deed X and to the will were genuine. Defendants also introduced several persons who claimed to be well acquainted with the handwriting of John Terwilliger, and that his signature to the will as a witness was, in their opinion, his genuine signature. The genuineness of William Terwilliger as a witness to deed X is admitted.

The arguments of counsel were principally directed to a discussion, review, and criticism of the testimony of the professional experts Mr. Hyde and Dr. Piper. These witnesses prepared a great number of plates and tables showing the signatures and letters of each signature to the deed X and to the will, and the comparisons thereof with the admitted signatures of Philinda Terwilliger and John Terwilliger to the various exhibits offered in evidence. Some of the tables prepared by Dr. Piper make comparisons of the signature of Philinda Terwilliger with the signature of her name as found in the Bible and on the bank bill. All of the tables prepared by him were made by the aid of his microscope and camera lucida. Enlarged photograph copies,

proven to have been correctly made, of the will, and of the signatures of Philinda Terwilliger on the standards, in the Bible, and on the bank note, and of the signature of John Terwilliger, as found in the county warrant book, in a mortgage, and to the marriage certificate, were admitted in evidence. These copies were of great assistance and value to the counsel in their arguments, and have materially aided the court in its investigation, in comparing and examining the different specimens of handwriting exhibited in the original documents. "Proportions are so enlarged thereby, to the vision, that the faint lines and marks, as well as the general characteristics of handwriting, which perhaps could not otherwise be clearly discerned and appreciated, are thus disclosed to observation, and afford additional and useful means of making comparison between admitted signatures and one which is alleged to be only an imitation." Rog. Exp. Test. p. 336.

The testimony of John Orvis Waterman to the execution of the will is direct and positive. At the time of giving his testimony, two years ago, he was 65 years of age. He testified in chief that he came to Portland in May, 1851; that at one time he was publishing printer of a daily newspaper; that he was probate judge of Washington county three years, elected in 1853; that from 1857 to 1861 he was surveyor and inspector of the port of Portland; that he was postmaster in Portland for six months in 1853; that during his residence in Portland he became intimately acquainted with James and Philinda Terwilliger; that just after the great fire in Portland, in August, 1873, he wrote the will of Philinda Terwilliger, at her request; that he obtained from her a knowledge of the disposition she desired to make of her property; that she said to him that "she wished to arrange her business, and to give Julia her property;" that the will was written at the residence of the family; that Philinda Terwilliger was in her usual health; that she signed the will in his presence, and in the presence of John Terwilliger, and that he and John Terwilliger signed their respective names as witnesses to her signature; that no other person was present; that, after the will was written and witnessed, it was put into an envelope, and handed to Philinda Terwilliger; that he never spoke to any one about the will, and never saw it, after its execution, until in March, 1889, at the residence of James Terwilliger, about the date when it was probated in the county court. The cross-examination of this witness was very lengthy. He repeated the history of his life, gave the occupations in which he had at various times been engaged, either as editor, publisher, or reporter; that in 1868 he was elected a justice of the peace, and served two years; that he had been employed at Lake River, in a store; that he had taught several district schools at different country places; that at times he boarded round with the scholars; that he received small salaries, and had few pupils; that he was married in 1855; that his wife procured a divorce from him in 1861; that he "used to drink with the boys and men about town;" and that he occasionally drank to excess. To quote his own language: "I never got so drunk but what I knew what I

was about, I think. I don't remember as I did." This witness also testified that he was in Portland in June, 1874, and remained there for two months; that he then heard of Philinda Terwilliger's death from her husband; that he then met the daughter, Julia, and her intended husband, Mr. Richardson, at the family residence, but did not mention the execution of the will; that he was frequently at James Terwilliger's residence after that time; that in the year 1880 he taught school in that immediate vicinity, and was at the Terwilliger residence nearly every evening; and that he boarded with Hiram Terwilliger and Mary Terwilliger, the son and daughter-in-law of James Terwilliger, who lived near by. It appears from the testimony of other witnesses that Waterman and John Terwilliger were in Portland in August, 1873, about the date the will purports to have been executed. The witnesses all fix the date as being shortly after the great fire in Portland, in August, 1873. Waterman's is the only direct testimony as to the execution of the will by Philinda Terwilliger. James Terwilliger testified that some two or three days after the death of his wife he found the will and the deed X in the drawer of a table in a closet adjoining the bedroom; that it was in a drawer where his wife "kept her little knickknacks and papers;" that he left it where he found it; that it and the deed remained there from that time until after he was served with summons in this suit. With reference to his knowledge of the execution of the will, and to its custody, he testified, among other things, in answer to questions, as follows:

"Answer. I first learned it—I think John Terwilliger probably told me—not long after she made it, but she didn't say nothing about it, and I didn't. In fact, I didn't care much about it, and before she died she and I had a considerable long talk. Only a short time before she died she requested me so and so about Julia,—to look after her things so and so; and she said, says she, 'The papers, you will find them in such a drawer, with my papers; and they are all right, just as I want them.' But says I, 'Are you sure they are all right?' She says, 'Yes, they are all right.' Well, that's the last of it for some time afterwards. Question. Did she say anything to you at that time about what disposition she had made of her property? A. Not exactly, no. She told me before that what she intended to do. Q. Did you find the papers, after her death, where she said they were? A. Yes, sir. Q. Who was present when you found them? A. I guess no one. Q. What was your idea for keeping the papers so long? A. Well, I supposed a will was just as good to keep it as long as I lived, or longer, for that matter, so it came to light. Q. Do you remember of any person connected with the estate of William O. Green calling at your house to see the papers, or ask to see the papers, at any time? A. No. William O. Green came there once. I was sick at the time, and the last time he was there he agreed to come back again. That was the time I calculated to show it to him, but he didn't come. He went to Tibbets, and from there he went home. Q. And did not return? A. No. Q. You had the papers at that time, did you? A. Yes. Q. Do you remember about how many years you kept them? A. In all? Q. Yes. A. Probably 16 or 17; 16, probably. Somewhere along there. I could not tell exactly. Q. You had the care and possession of them during all that time, did you? A. Yes; they were there, and nobody else had them, and nobody else tampered with them,—not until after this suit commenced. Q. What was done with the papers after this suit was commenced? A. Well, after this suit was commenced, Mrs. Richardson came up there, and she and I went and got them. She took them. They belonged to her. Q. You found them where you supposed they were, did you? A. Yes. Q. By these papers given to Mrs. Richardson, do you refer to this deed that was shown

to you to-day, and the will? A. Yes, sir. * * * Q. Did you ever show the will to anybody, from the time you found it until the commencement of this suit? A. I think not. I don't remember that I ever did. Q. Did you ever tell any one about it during that time? A. I don't remember. I didn't talk about these things much. I don't remember that I did. * * * Q. Did you know, all the time you kept this deed from your wife to Julia, which you kept for 16 or 17 years in the clothespress along with the will,—did you know that the deed was not recorded? A. I knew it was not, yes; of course, when I read it. Q. You knew, then, all the time you were keeping it there, that it was not recorded? A. Yes; I knew that, of course, and I supposed, probably, that, after the will was made, the deed, as it hadn't been acknowledged or recorded,—I supposed, probably, that was good for 'nichts,' (nix,) as the Dutchman says. But that is only my supposition. But the will, I never supposed it made any difference,—and I don't yet,—whether it is probated or not. Q. How did you come to have that opinion of the will? A. Well, because I have read about so many hundreds of them in my life. Q. What was it you read and understood about a will, in regard to recording? A. Well, if a will turned up, and had never been probated; and I think I have read that even if the witnesses were dead, but circumstances, and so on, that the will stood good. Q. Where did you read that? A. I have read it in papers. Q. A long time ago? A. Yes, a good while ago; and some wills not such a great while ago. Q. You always understood that was the law, did you, with regard to wills? A. Well, yes. If it was substantiated, it was good; that is, if a person could make anything good. Q. Did you not also know that wills were customarily or commonly probated promptly, and soon after the death of the testator, or the person who made the will? Was not that known to you to be customary and common? A. It appears it is customary, some places, amongst some people, to read the will at the time they are buried; and others, at any time when they see fit; and, at others, lay for years,—some, for a good many years. But if a will or deed was destroyed, in my opinion, and the witnesses remembered the circumstances and everything, I believe it is just as good as the original document. * * * Q. Did you not testify a while ago that you had calculated to tell William Green? * * * A. Yes. I calculated to show him the will then, and his wife was there, and said something about the clock, and I told her it was in the dining room. I told her she could take it home, if she wanted to, but she didn't. Q. What clock have you reference to? A. That was the one mentioned in the will. Q. Did you ever tell her about the will? A. No, I did not. Q. How did she know of a clock in the will? * * * A. I don't know as she knew it, but wanted to know if that is the clock they fetched across the plains with them; that one. I told her no. That one, I told her, was in the dining room; and I told her she could take it home, if she wanted to. She didn't say whether she would take it or not, but she didn't take it."

It appears from his testimony that during the 16 years mentioned he took several trips to Tillamook, distant from Portland about 90 miles, and remained there about one month at a time; that in 1878 he took a journey to Europe, and was absent from Portland four months.

Mrs. Julia V. Richardson testified that she did not know of the execution of the will before her mother's death, and in testifying about Exhibit X the following testimony appears:

"Question. Did she ever speak to you, at any time other than at the time you have testified here, concerning this instrument? Answer. She has. I don't know as especially of this instrument, but to the same effect. She has often told me, and often given me good advice, and told me she wanted me to do certain things; that all she had would be mine; that she had provided for William Green, and did not propose that he should get any of her property. She, also, the night she died, called me to her, and told me that everything she had,—she had everything fixed just as she wanted it, and

that everything she had was mine. Q. Did she ever show you any other instrument which has since been filed as her will? A. No, sir; she never did."

She further testified that she first saw the will about the time it was probated; that she got it from her father; that the deed X was shown to her at the same time by her father; that she had heard of the existence of the deed X before her mother's death; that she knew nothing of the will until her uncle, John Terwilliger, told her about it in Tillamook in 1881:

"Question. What did he say to you in reference to it? Answer. I was in Tillamook in 1881, and he asked me if my mother had given me her will when she died. I told him no; and he said she had made a will, and he knew it, and, if she had not given it to me, my father must have it. I said, 'Uncle John, are you sure she made a will?' He said, 'Yes; I know she made a will, and your father has it.' That was the first I ever heard that she had made a will."

Julia testified that about one year after William O. Green's death, which was in 1878, his widow, Mary F. Green, came to Portland, and they had a conversation about the property. After repeating the conversation which the witness had with Mrs. Moffatt, a daughter of James Terwilliger, the following testimony is given as to the conversation with Mrs. Green:

"My mother's and father's pictures were hanging up over the mantelpiece,—that was the way the conversation came up,—and she spoke about how badly her husband felt that he was not able to see his mother before she died. She said, 'Julia, I have heard grandma left papers giving everything she had to you.' And I said, 'Yes, Mary, she did.' She said, 'I don't believe it.' 'Well,' I said, 'Mary, she certainly did.' She said, 'I don't believe it. William thought so much of his mother. She would certainly have given him as much as she did you.' She did not believe she had done that,—that she had fixed her property in that way. Then I repeated the conversation that my sister had told me that she and my sister had had; and she says, 'I will sign nothing.' I said 'Mary, I have not asked you to sign anything.' She says, 'Even if I would sign a paper, how could I sign my children's rights away.' I mentioned that I thought she was her children's guardian, and she said, 'I am their guardian, but I will sign nothing.' I said, 'I have not asked you to sign anything.' I said, 'Mary, would not you like to see those papers?' She said, 'Yes, I would.' I says, 'When father comes in, if he is willing, I will let you see them.' Father came in soon after, and I requested him to show her the papers, and he said, 'All right.' He went into his bedroom, and unlocked his clothespress door,—for the lock, you could hear it when he unlocked it. I did not go in with him, but I heard him unlock the clothespress door. She said, 'I do not want to see the papers. I will not look at them. But if you can produce those papers at the proper time my children and myself will never give you any trouble.' I told father that she did not wish to look at the papers, and that he need not get them. He said, 'All right; now, when she gets a chance to look at those papers, she will be glad enough to look at them.' This is all the conversation I ever had with Mrs. Green about those papers, or about any property, that I ever remember."

After Calvin's death his brother went to Nevada to look after his estate, and while there sent a letter requesting his mother to give him a power of attorney, so that he could administer upon the estate. A power of attorney was on the 13th of September, 1873, within one month after the will bears date, executed by James Terwilliger, Philinda Terwilliger, and Julia Terwilliger. It was an ordinary power of attorney, simply giving to William the right to administer upon the estate. It did not waive any rights which

they, or either of them, might have in the proceeds of the property of Calvin's estate. The amount realized from the estate by William was less than $200, which he retained. As a matter of fact, the amount received was not sufficient to pay William's actual expenses. With reference to the execution of this power of attorney, James Terwilliger testified:

"It wasn't a power of attorney exactly; and we made an assignment, understand. My wife, she proposed it, and sent down, and got a lawyer, and— I'll be hanged if I remember now what lawyer. But he came up there, and suggested, probably, it was best, and he told why, and he drew up an assignment; and my wife and I and Julia signed off all our right, title, and interest to it, which was the same as a power of attorney would be, in order for him to administer on the property that was there."

Julia V. Richardson testified in relation to it as follows:

"My brother was murdered, and my older brother, William Green, went to Eureka, Cal., [should be Nevada;] and he could not settle up the business until he received this power of attorney, as we were heirs to my brother's estate, as well as he, and he sent this to get our signatures to it. My mother talked it over with my father, and she said she thought it would be no more than right to give him everything that belonged to his brother; as everything they had made they had together, and as she had nothing when she married my father, she intended that that should go to me. She and father had that talk, and she came into the room, and asked me if I was willing. She said, 'I don't want to influence you, but, if you think it is right, will you sign all your right and interest?' 'Well,' I said, 'if you think it is right, mother, I will.' And she said, 'Well, father and I have had this talk, and we think it no more than right, as everything that is mine will be yours.' And I signed it willingly."

Mrs. Elizabeth Cathcart Smith testified that in August, 1873, she had a conversation with John Terwilliger about the will of Mrs. Philinda Terwilliger. That John came, and told her that "Julia would be a rich woman. * * *" That her mother had willed her all that she had, and that the property was very valuable, and that she would come in for a share of her father's property. That John told her "not to mention it to nobody, and I did not" until Mrs. Philinda Terwilliger died. That at the time of her death she was in the room, and heard a conversation between James Terwilliger and his wife, Philinda. That Philinda told her husband "there is some paper or something,—I cannot tell what,—told him there was something put away in the drawer. She first said, 'The doctors say I cannot live;' and he said, 'No.' She says, 'Yes, I heard them tell Lizzie,' [meaning Mrs. Smith.] She said, 'You will get it in the drawer.' That is what she said. What it was, I do not know. She said: 'You will get it in my drawer. I will tell you now, while I am able.'" That, after this conversation, Philinda had a talk with Julia; "told her to be a good girl, and to be always as good as she was now, for her mother's sake; 'that is all I ask, and all I own is yours.'"

Mrs. Mary Terwilliger testified that in the fall of 1873, when she was living at Tillamook, she read of the death of Philinda Terwilliger in the Oregonian newspaper, and that John Terwilliger then told her that Philinda had made a will, and that it was written by Waterman, and witnessed by himself.

Dora Robertson, formerly the wife of Sol. Terwilliger, a brother

of James, testified that she saw Philinda Terwilliger during her last illness, in the fall of 1873, and that they were alone together. They had a conversation. That Philinda said:

"I have got done what I wanted to have done. * * * I have got my will made. * * * I have willed all my property to Julia. * * * Judge Waterman wrote the will, and signed it, and John Terwilliger signed it."

That she had previously had a conversation with Mrs. Philinda Terwilliger about leaving the property to Julia, when, to quote her testimony:

"She told me she wanted her first children, that she had by her first husband, to have all that she had out of her first husband's estate, and she wanted to give all that her and Mr. Terwilliger had made during her life to Julia; that they had had enough of their father's property. And then, at the time that Julia was sick, they had to sign a paper, and I remember her and Mr. Terwilliger talked to Julia, and she says, 'Julia, we will have to sign this paper,' and Julia says, 'Ma, it will do no good to sign the paper, because, after you are dead, they will come in for the property, just the same.' 'No,' Mrs. Terwilliger says, 'they cannot do that. I have got that fixed so they cannot do that.' Those were the words she said."

Joseph J. Dawson and William Ralston testified that John Terwilliger, after the death of Philinda, told them that she had made a will, and left all her property to Julia. John seemed to have talked freely about it, but all the other members of the Terwilliger family were silent.

The question to be determined is not whether Philinda Terwilliger ever made a will, but, if it be conceded that she did, is this her will? Does the testimony in this case establish the fact, to the satisfaction of the court, that this will was signed by her? Does the testimony, in like manner, show that the signature to the deed X is her genuine signature? Are both documents genuine, or have they been forged? The contention of defendants is that the genuineness of the signatures of Philinda Terwilliger to both instruments has been established by positive and direct testimony, and that this character of testimony is entitled to the greatest weight. Is this contention tenable? Is it supported by the facts, by reason, and by authority? The only evidence to the genuineness of the signature of Philinda Terwilliger to the will, by persons familiar with her handwriting, is her husband, James Terwilliger, their daughter, Mrs. Julia V. Richardson, and his daughter-in-law, Mary Terwilliger. The weight and value of this character of testimony depends in some degree upon the frequency with which the witnesses have had occasion to notice, and carefully observe, the handwriting, and how recent their opportunities for noticing the handwriting have been. The fact as to whether or not the witnesses have any interest in establishing the genuineness of the signature is always to be considered, in determining the weight and value of the testimony. The facts and circumstances testified to, in connection with the declaration of Mrs. Philinda Terwilliger in regard to her execution of the will, and of her intention to give all her property to Julia, depends to some extent upon its reasonableness and probabilities—in view of other facts and circumstances that appear in evidence—of its truth or falsity.

There are many circumstances, wholly independent of the testimony of the experts, which tend to cast a doubt upon the truth of some of the testimony, and to raise a suspicion as to the genuineness of Philinda Terwilliger's signature to the deed X and to the will. No valid reason has been shown why Philinda Terwilliger should have selected her daughter, Julia, as her sole beneficiary. Her relations with her sons seem to have always been friendly. True, they had gone out in the world, and fought their way in the battle of life independently. They had, it is said, what their father had left,—two yoke of oxen, one wagon, some cattle. How many, or of what kind or value, is not shown. Her daughter, Julia, had grown up in the household, and had received her mother's daily care and attention. It may have been natural that the mother's affection for her daughter was, in a measure, stronger than for the sons; but it is unnatural that she should have entirely ignored her sons by a former marriage.

The testimony of Waterman is to the effect that he was aware of the laws of Oregon, which require that the children must be mentioned in the will, in order to prevent them from inheriting their share of the estate. 2 Hill's Ann. Laws, § 3075. If it was the desire and intention of the mother to bequeath all her property to Julia, it was his duty to have called her attention to this law. He testified that he did not then know that she had any other son than William; that she only spoke of William O. Green. This is unnatural and improbable. Other facts show clearly that she had not forgotten Calvin. At the date of the will she could not have known of Calvin's death. By a singular coincidence, Calvin was murdered on the same day that the will bears date, but the fact of his death was not known, or his body discovered, for a week thereafter; and the first knowledge which the mother had of his death was received in Portland on the 21st or 22d day of August, 1873, through a telegram from G. Collyer Robbins to Walter Moffatt. Why should she have remembered William in the will, and not have mentioned Calvin? If the object of mentioning William was to comply with the law of Oregon, so as to prevent him from inheriting any share of her property, then, of course, Calvin's name would have been mentioned, also, unless he had been forgotten. If the old clock, which is not shown to have been of any value, was given to William as a memento or family relic, then why should she not have picked out some other article, in remembrance of the early associations, to be given to Calvin? It is said, in explanation of this, that the clock belonged to William's father, and that for this reason it was given to William. This explanation is not supported by the words of the will. The language there is, "My clock, which I brought across the plains." But, if it was the father's clock, and if there was nothing else that belonged to the father to give Calvin, is it not reasonable to believe that the mother would have selected something of her own, that she had brought across the plains, to be given to Calvin? The Bible seemed to have been the common property of both husband and wife. It contained the name of the father, as well

as the mother, by whomsoever written, and the family record of the marriages, births, and deaths of the Greens, except of Calvin's death. Or, if this priceless gift was also to be reserved for Julia, then there was the bank note, of equal value with the clock, and just as precious, as a memento of the trip across the plains. From any standpoint that may be taken of the mother's motives in executing the will, it seems unreasonable, unnatural, and improbable that Calvin's name should have been omitted from any will she might have made on the 14th of August, 1873. The mother's conduct after the execution of the will, when she heard the sad news of Calvin's murder, and asked her husband for money enough to bury the dead body of her son, and to employ counsel to prosecute his murderer, shows conclusively that she had not lost her affection for this son.

When the witness Waterman was asked if Philinda Terwilliger made any explanation at the time as to why she simply gave the clock to William, and the land to Julia, he said:

"Yes, sir; I think she said something about like this: That he had had his time to make money, and had not helped accumulate any of this, and she wished Julia to have this portion; that the boy by a former husband had had his time to make money, and had not helped make any of this. That is about the gist of the matter, that I remember Mrs. Terwilliger remarked at the time. That was the reason she wanted Julia to have this part,—he had had his time to make enough for himself. That is the way I understood it at that time, as nearly as I can recollect."

Does it seem reasonable that the mother could have made this statement? William was not the only "boy by a former husband" who "had had his time to make money, and had not helped make any of this." If she made any statement about her children to Waterman at that time, it would have been natural for her to speak in the plural number of her boys, and both, if either, would have been mentioned in the will.

The reasons given for the delay in probating the will are another circumstance that is to be considered, and the testimony upon this point is by no means satisfactory. The fact of delay is outside of the ordinary conduct of men. So, also, is the testimony of the discovery of the will. James Terwilliger knew there were some papers in the drawer of the table in the closet, but he did not examine them. Julia, notwithstanding her knowledge that her mother had fixed the papers, and deeded all the property to her, never made any search or inquiry to find the documents. The drawer in the table, where the valuable documents had been deposited, was not locked, but the door to the closet usually was. The family were occasionally required to go to the closet where this table was, for bedclothes and change of linen, yet the drawer where the mother kept her trinkets was never opened or examined. This may have been the conduct of the household, but it is not natural or reasonable conduct of ordinary people, under such circumstances. The father is shown to have been absent for four months at one time in Europe, and for a month at a time, during several years, at Tillamook. The reasonable mind would naturally expect that some member of the household would have

opened the drawer, and read the papers, if they knew of their existence. If Mrs. Smith knew of the existence of the will prior to the death of Mrs. Philinda Terwilliger, is it not singular that she did not inform Julia of its existence after the mother's death? The injunction of secrecy imposed by John Terwilliger upon Mrs. Smith could not, after the mother's death, have been considered of any binding force. Is it not singular that, with the knowledge testified to by several members of the Terwilliger family, they should so long have concealed the truth from Julia, and that her first knowledge of the existence of any will should be derived from her uncle John, at Tillamook, in 1881,—seven years after the time it bears date? In the light of all the circumstances, I am unable to say that the genuineness of the documents is established by positive testimony, that is entitled to the greatest weight, when compared and weighed with all the other testimony in the case.

The signatures in the standards offered in evidence show that in 1871 Philinda Terwilliger changed her style of making the capital "P." Prior to June 12, 1871, she made it with two strokes of the pen, commencing first at the top of the lines of the letter, and drawing the line down, and making a curve at the bottom, with a downward stroke. Thereafter she made the "P" with one stroke of the pen, commencing at the top of the line or stem, coming down to the ruled line of the paper at the bottom, then going up, on the left-hand side of the stem, with a curve, and crossing the main stem near the top, and ending with a shaded downward-stroke. This was the character of this letter made by her in her signatures to a deed executed July 24, 1873,—20 days before the date of the will,—and to a deed executed September 13, 1873, and another September 15, 1873,—one month after the date of the execution of the will. The capital "P" in the will signature—also in deed X—is made with two strokes of the pen, but is made essentially different from the "P" made with two strokes by Philinda, as found in the standards. As illustrative of the manner of the testimony of the experts, and of the difference in this particular letter, I will read from the testimony of Mr. Hyde, which, in so far as it is confined to the facts, is verified by an inspection of the documents. The reference to the figures 9, 3, and 12 are to the standards of the admitted signatures, as written by Philinda, with the capital "P" made with two strokes of the pen. After mentioning the fact that the main stem of the "P," as made in the standards, is different from that found in X, or the will, he testified:

"There is a still more marked difference in the upper stroke of the 'P.' Philinda, in making the top member of the 'P' with the double curve there, commenced near the top of the letter, with one single stroke, and slight pressure upon it,—but still distinct pressure,—and one single oval one there, brings that main stem over, according to her habit, down, to a greater or less extent, while the writer of X has made a double curve inside of his commencement. He has not commenced the letter as Philinda commenced hers, at the top, but commenced it away to the left, and commenced with an upstroke first, and then a rounded downstroke, before the main upstroke is reached. It forms a closed loop there, with a double line at the commencement, and is as radically different from that form of letter as could well be imagined. And following there, we find the top of the letter, which is almost hori-

zontal, contains the pressure, while the lower and downward stroke of the right-hand side of this upper member, instead of increasing in pressure,—increasing at first, and then diminishing,—has obtained its maximum pressure nearly where it crosses the top line in X, and diminishes then continuously, when it makes the turn down to the extreme lower portion of the line. Now, that is the 'P' in X. The 'P' in the will is also formed on the same line as the 'P' in X, and the same line as the 'P' in 9, 3, and 12. But there, again, is a radical difference both from the genuine, as shown by the standards here, and from the signature in X, and shows that these two (X and the will) were not made by the same hand, and the one is an imitation of the other, for here we find these characters resemble. The main or principal stroke of the capital 'P' has almost identically the same form of commencing in both the will and X, while in its completion it is much more smoothly and symmetrically formed in the will than in X, evidencing a different and more skillful hand—a very much more skillful hand—in the will, and following habitual lines in the will,—lines that the writer was accustomed to,—whereas the lines of the letter 'P' in X were lines to which the writer was not accustomed, and hence that awkward stroke over the top of the 'P.' Now, the 'P' in the will, irrespective of the difference in the upper member,—its radical difference from everything found in the genuine, as well as from the 'P' in X,—shows some other very marked distinctions from the genuine 'P's,' as found in these standards. We have in this 'P' of the will an unusually graceful and symmetrical stroke for the main stem. It is a stroke made by a person familiar with copy-book writing. It is commonly known, as I understand it, as the 'Spencerian Method of Penmanship.' It was made by a facile pen,—by a man who could wield a pen,—and is as impossible to any effort of Philinda Terwilliger's as it is possible to imagine. I can imagine nothing more impossible to Philinda Terwilliger than to make such a letter 'P' as is found in the will, I have already spoken of the double lines found in the capital 'P' of the will, and the indication of several movements of the writer, and several light strokes of the pen, the reasons of which I am unable to discover,—can only conjecture. Now, these examples show, better than any description of words that I can give, the difference in the forms of these letters."

This letter "P" is used for illustration because it is the first letter in the signature. Differences have been pointed out in like manner, and at as great length and as much minuteness of detail, in each of the other letters of the signature, noticeably, the character of the letter "h," and its close proximity to the capital letter "P;" the regularity in the height of the "i's;" the omission of the upward stroke at the end of the letter "a;" the difference in style of the capital letter "T;" the flat-shaped "e," following the capital "T;" the loop in the "r's," and the loop connecting the "w" with the "i," and the symmetrical form of the "g,"—all of which letters are made essentially different from the same letters found in the standards. The tremulousness in the letters of "Philinda Terwilliger" in the standards is much clearer, and more distinct, than is found to exist in the letters in the signature to the will. There is an erasure in the signature to the will over the letters "in" in Philinda. The writer first wrote either "lil" or two "ll's," and then carefully erased the top part of the second letter, so as to form the "i," or the first line of the letter "n." John Orvis Waterman testified that he did not notice that any erasure was made when the will was signed. It appears that it was Philinda's habit to make mistakes, occasionally, in writing her name, but her mistakes were never erased. She did the very best she could in writing her name. In the first signature she made—October 26, 1865—the right side of

the top portion of the capital "P" comes clear down to the bottom, on a line level with the bottom of the main stem of the letter, the first "i" in "Terwilliger" extends upwards like an "l," but no attempt was made to erase it. In a signature made in April, 1871, there was a mistake in the "w." In May, 1871, in making the "w," a line was overlooked, and it remains somewhat like a "v." On September 13th the second "i" in "Philinda" has one line like an "l" above the line, and the "w" in "Terwilliger" is short one line, leaving it like the letter "u." Why should the erasure only be found in the signature to the will? Why should the work have been so carefully done? Is it reasonable to believe that it was done by Philinda Terwilliger? It is unlike the usual course of her conduct in writing her name to all the other documents. The general appearance of the signatures to the deed X and to the will is radically different from the signatures of Philinda Terwilliger to the standard exhibits. There is scarcely a letter in either that bears a close resemblance to the admitted signatures. All of her admitted signatures show that she made her letters on a definite plan; that she possessed certain fixed habits of writing, which are not found in the signature to the deed X, or to the will; and that, notwithstanding the variance in the slope, or the break of the pen, or other peculiarities in some of the letters, the essential characteristics of her writing are found in all of her admitted signatures, and do not exist in the signature to the deed X, or in the signature to the will. The writing of the signature to the deed X has the appearance of having been written by an unskilled person, untrained in the science of handwriting, and has the resemblance of an effort on the part of the writer either to disguise his own writing, or to imitate some other person's handwriting, or both. It does not have that bold, clear, independent, and positive characteristic that is discernible at a glance in every admitted signature of Philinda Terwilliger. It is designated by some of the expert witnesses as "a scratchy, illiterate hand, absolutely different from the * * * Philinda Terwilliger' to the will." A distinguishing feature of the signature to the deed X is also found in the fact that the letters "williger," in "Terwilliger," come down in a peculiar manner below the ruled line of the paper, entirely different from the genuine signatures of Philinda Terwilliger.

It was suggested by defendants' counsel, in the oral argument, that the shortness of the signature, cramped letters, and other peculiarities, could be accounted for by the fact that the line drawn down on the deed between the names of the witnesses and the signature induced the writer to make the letters close together; but the signature, as it is written, covers but little over half the entire space on the right-hand side of said line, and, if the purpose of the writer was to avoid running the signature into the word "Seal," then, in this respect, it differs from the ordinary habit of Philinda Terwilliger in writing her name. While her genuine signatures are not precisely of the same length, none of them are written in such a cramped hand, or peculiar manner, as found in the deed X; and no attempt seems ever to have been made by her to

shorten her signature on account of the limited space for writing in front of the seal. To a deed executed July 24, 1873, she wrote her name with the letters "liger" along the line, just under the scrawl of the seal; and to another deed, signed the same day, she wrote the letters "illiger" through the lower part of the scrawl of the seal; and in none of these signatures was there any effort or attempt to cramp or shorten her signature. It is manifest, from a careful inspection of her writing, that she had but one way of writing her name. The only change she ever made was in the form of the capital "P," and, in one instance, in the capital "T." Although no two of her signatures were, as before stated, precisely alike, yet they were all written in the same slow, careful, positive, and distinct manner. The differences in the length of the space covered by her signatures, or of the slope of the letters, or of the breaks of the pen, or of the regularity or irregularity in following the ruled line closely, were only such as would be liable to arise from the use of different pens, or different ink or paper, or in different positions and surroundings under which her name was written. In every admitted signature there is her individual characteristic, that is clumsily and poorly attempted to be imitated in the signature to the deed X, and can hardly be said to exist at all in the signature to the will. The writing of the signature to the will shows a full, round, capable, and fluent and easy hand, —the letters of the signature being, in the main, much more smoothly and symmetrically formed than in the signature to the deed X, or in any of the admitted genuine signatures,—and indicates very clearly that the signature was written by a person of experience in handwriting,—by a practiced hand, familiar with the use of a pen. Experts, in determining the genuineness of handwriting, or its falsity, seldom confine themselves solely to the appearance of the similitude or dissimilitude of the individual letters. An analysis of the signature as a whole is, or should be, always made. Experiments, observations, and experience have disclosed the fact that there are certain general principles which can often be satisfactorily relied upon in determining the genuineness of handwriting. In nearly every person's manner and style of writing there is a prevailing and distinct character, which is more or less independent of the writer's will, and unconsciously forces the writer to stamp the writing as his own. By nature, custom, and habit, individuals, as a general rule, acquire a system of forming letters which gives to their writing a fixed character, as distinct as the features of the human face, which distinguishes their own handwriting from the handwriting of every other person.

There are other important facts, and many minor details, in the evidence, which were commented upon by the respective counsel, that have not been specially referred to; but the entire testimony has been read, and carefully considered. The object, aim, and end of this investigation has been to ascertain the truth. The examination of all the conflicting evidence, and of all matters relating to the disputed questions, has been thorough, with an eye single to this purpose. From every standpoint from which the examina-

tion of the evidence has been considered, and the disputed points therein investigated, the mind of the court has been irresistibly led to the conclusion that the signatures of Philinda Terwilliger to the deed X and to the will were never signed by her, and that both of said signatures are false and forged. This conclusion is supported by a preponderance of the evidence. It is apparent to my mind, from a close examination of the signatures, that the same hand that wrote the signature of Philinda Terwilliger to the will also wrote the signature of John Terwilliger as a witness thereto; and, from the inspection and comparison of the handwriting of the signatures on the admitted standards, it is equally clear that the hand that wrote these names to the will was not the hand of Philinda Terwilliger. If it could be said, as claimed by defendants' counsel, that the testimony establishes the fact that the signature of John Terwilliger as a witness to the will is genuine, the only effect of this would be to prove that he must have written the name of Philinda Terwilliger, for both of these signatures were, in my opinion, evidently written by the same person. The theory of the complainants is that John Orvis Waterman wrote all the signatures, and much of the testimony offered by them has been directed to this point. To support this view they have specially directed the attention of the court to the entire handwriting of the will, and to the testimony of some of the experts, of the similarity of some of the letters in the signature of Philinda Terwilliger with the same letters, found in different places, written in the body of the will,—especially the likeness and close similarity of the shovel-nosed or peaked top of the letter "h" after the capital "P" in Philinda with the letter "h" found in the words in the will "Multnomah," "wishing," "brought," and "three," and divers of other peculiarities of the similarity of his handwriting with that found in the signatures of Philinda Terwilliger and of John Terwilliger to the will. There is also a close resemblance between the word "Philinda," as written on the second line in the body of the will, with the word "Philinda" in the signature to the will, showing conclusively that the writer of the one was capable, at least, of writing the other. Like comparison is made with the writing in the will with certain letters in the signature of John Terwilliger, especially of the roundness of the letter "o" in "John," the manner of making the capital "T," the Greek "e," and the changes in the letter "g," in "Terwilliger," with the same result. But it is unnecessary to follow counsel in this branch of the discussion. It is enough to say that the evidence, in my opinion, clearly shows that Philinda Terwilliger did not write her name to the will, without attempting to fasten the forgery upon any given person.

Complainants are entitled to the decree prayed for in the bill.

NOTE. This case was argued and submitted to Judge Sawyer in April, 1891, but he died without having filed his decision. In said argument the complainants were represented by H. T. Bingham and E. W. Bingham. Before the reargument, H. T. Bingham also died.